**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

JENNIFER AUER JORDAN and              :
SHAMIRACLE J. RANKIN,                 :
                                      :
    Plaintiffs,                      :
                                      :
v.                                    :        CASE NO.: 1:26-CV-57 (LAG)
                                      :
VICTORIA S. DARRISAW, *et al.*,       :
                                      :
    Defendants.                      :
                                      :

## ORDER

Before the Court is Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7). For the reasons below, Plaintiffs' Motion is **GRANTED in part** and **DENIED in part**.

## FACTUAL & PROCEDURAL BACKGROUND

On May 1, 2026, Plaintiffs filed a Complaint (Doc. 5) alleging a violation of First and Fourteenth Amendment rights by Defendants—Victoria Darrisaw, James Coursey, Jr., and Warren Selby—in Defendants' *official capacities* as "Special Committee" members for the Judicial Election Campaign Intervention (JECI) of the Judicial Qualifications Commission (JQC). Plaintiffs are candidates for Justices of the Supreme Court of Georgia in "a hotly contested race . . . [in which Plaintiffs] made women's health a central focus of their campaigns." (Doc. 5 ¶¶ 1–2). Plaintiffs argue that their "Free Speech rights" are being violated by Defendants' application of certain parts of the Code of Judicial Conduct to Plaintiffs' speeches, campaign commercials, and social media posts. (*Id.*).

On April 27, 2026, both Plaintiffs received letters from the JQC setting out alleged violations by each of their respective campaigns and requesting an expedited response within three days of the letters' receipt. (*Id.* ¶¶ 22, 30, 31, 38; Doc. 31-1 at 10–13, 25–28). Plaintiffs filed this action in response to the JQC letters. Plaintiffs request a declaratory

judgement barring Defendants from applying Canon 4 and Rules 4.1(A)(2), 4.2(A)(2) and 4.2(A)(3) in a manner that is inconsistent with constitutional guarantees, enjoining Defendants from enforcing the Canon and Rules against Plaintiffs in the matters identified in the JQC letters, and/or enjoining Defendants from making a public statement of the current allegations.

Plaintiffs simultaneously filed a Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") (Doc.7), requesting the Court to issue a temporary restraining order and preliminary injunction against Defendants. Plaintiffs request an order from the Court "prohibiting the [D]efendants from continuing the investigation of the [P]laintiffs' campaign statements in the [JQC] letters and from otherwise enforcing Canon 4 and Rules 4.1(A)(2), 4.2(A)(2), and 4.2(A)(3) of Georgia's Code of Judicial Conduct against the [P]laintiffs in connection with the campaign statements and conduct identified in those [JQC] letters." (Doc. 7 at 33).

On May 4, 2026, the Court *sua sponte* requested briefing on the matter of venue. (Doc. 11). Plaintiffs and Defendants filed their respective responses (Docs. 15; 21) to the question of venue, and Plaintiffs filed a reply (Doc. 23). On May 8, 2026, Defendants filed their Response to the Motion (Doc. 31) and attached a declaration by C. Veal, Director of the JQC with exhibits (Doc. 31-1). Plaintiffs filed a Reply (Doc. 40) and included declarations from Plaintiff Jordan (Doc. 40-1) and Plaintiff Rankin (Doc. 40-2). The Court held a Motion hearing on May 11, 2026. (*See* Docs. 17, 43). During the hearing, the Court found that venue in the Middle District of Georgia was proper and allowed Parties to present their arguments. (Doc. 45 at 7); *see* 28 U.S.C. § 1391. Accordingly, the Motion is ripe for review.

## I.  Supreme Court of Georgia & Judicial Qualification Commission

In an intermittent rotation, Justices of the Supreme Court of Georgia are elected by popular vote to six-year terms in nonpartisan elections. (Doc. 5 ¶ 8 (*citing* Ga. Const., art. VI, § 7, I(a))). Pursuant to the Georgia Constitution, the JQC "ha[s] the power to discipline [and] remove . . . judges as provided by this Article." Ga. Const. art. VI, § 7, ¶ VI(a). "The procedures of the [JQC] shall comport with due process . . . and . . . shall be subject to

2

review by the Supreme Court." *Id*. at ¶ VI(b). Importantly, the Georgia Constitution provides that "[n]o action shall be taken against a judge except after hearing and in accordance with due process of law." *Id*. at ¶ VIII.

The JQC operates pursuant to the Rules of the Judicial Qualifications Commission of Georgia.[1] *See also* O.C.G.A. § 15-1-21. The JQC, through the CIP, utilizes Rule 29 to constitute the Special Committee on JECI to "monitor[] judicial elections for compliance with Canon 4 of Georgia's Code of Judicial Conduct." (Doc. 5 ¶¶ 9, 17; Doc. 31-1 at 2); JQC Rule 29. Rule 29 states there shall be three members assigned to a Special Committee who are responsible "to deal expeditiously with allegations of ethical misconduct in campaigns for judicial office. . . . The objective of the Special Committee shall be to alleviate unethical campaign practices in judicial elections[.]" JQC Rule 29(A); (Doc. 5 ¶17).

The procedure for handling allegations of misconduct is as follows:

> Upon receipt of a complaint or other information facially indicating a violation by a judicial candidate of any provision of Canon 4 of the Georgia Code of Judicial Conduct during the course of a campaign for judicial office, the Director shall immediately forward a copy to the Special Committee members and the committee shall direct the Director to:
>
> (1) Seek informally, from the complainant and/or the subject of the complaint, such further information on the allegations of the complaint as the committee may deem necessary.
>
> (2) Conduct such additional preliminary investigation as the committee may deem necessary.
>
> (3) Determine whether the allegations of the complaint warrant speedy intervention and further investigation and, if not, dismiss the complaint and so notify the complainant.
>
> (4) If further investigation is deemed necessary, request confidential written responses from the subject of the complaint and the complainant on the following schedule:

---

[1] Supreme Court of Georgia, Case Information—Judicial Disciple, *JQC Rules* (February 3, 2023) https://www.gasupreme.us/jqc-rules/ (hereinafter "JQC Rules").

3

> (a) within three business days of receiving such a request from the committee, a written response from the subject of the complaint;
>
> (b) the committee will share the subject's written response on a confidential basis with the complainant, who shall be requested to provide a written response within three business days; and
>
> (c) the committee will share the complainant's response on a confidential basis with the subject of the complaint, who shall be requested to submit a written rebuttal within one business day.

JQC Rule 29(B); (Doc. 5 ¶¶ 17–19).

Confidentiality is paramount at the investigation stage as Rule 29 provides that the Special Committee "may accelerate this schedule or eliminate steps . . . [but the process] will remain confidential . . . unless that confidentiality is waived." JQC Rule 29(B). If there is a determination "that the allegations do not warrant speedy intervention," the Special Committee can dismiss the allegations or refer it to the CIP. JQC Rule 29(B). The imprimatur of confidentiality is lifted, however, if the Special Committee determines that

> the allegations do warrant speedy intervention the [S]pecial Committee is authorized to:
>
>> (a) immediately release to the complainant and the subject of the complaint a **non-confidential** Public Statement setting out the violations reasonably believed to exist; and/or
>>
>> (b) refer the matter to the full [CIP] for such other action as may be appropriate under these Rules.
>
> . . .
>
> D. Confidentiality and Further Proceedings. . . . In no event shall the committee have the authority to file formal charges or otherwise dispose of the complaint against any candidate for judicial office, which authority is reserved to the full Investigative Panel . . .

JQC Rule 29(B), (D) (emphasis added); (Doc. 5. ¶¶ 17–21). Thus, before a full investigation by CIP is initiated, the three members of the Special Committee—as a

4

government regulatory agency—may issue a public statement detailing the violations that the Special Committee reasonably believes a judicial candidate committed.

If the matter is referred to the CIP for a full investigation, Rule 17 sets forth the applicable procedure. JQC Rule 17(B), (C). The CIP reviews the Special Committee's findings and will "either dismiss the complaint or authorize a full investigation." JQC Rule 17(B)(3). Once a full investigation is initiated, within 10 days the Director shall provide notice to the subject of the complaint. JQC Rule 17(C)(1). The notice includes the allegations being investigated, the duty to respond—if requested, an "opportunity to meet with the Director or the Investigative Panel[,]" and the name of the complainant—unless the CIP determines confidentiality is necessary. JQC Rule 17(C).

After initiation of a full investigation,

> (1) The [CIP] may consider any of the following dispositions:
>
>> (a) dismissal;
>>
>> (b) private admonition or deferred discipline agreement;
>>
>> (c) the filing of formal charges; . . .
>>
>> (e) referral to an appropriate agency;
>>
>> (f) other sanctions as provided by Rule 6.B; or
>>
>> (g) resolution of the matter by the [judicial candidate's] agreement to resign or retire, with or without the [judicial candidate's] agreement not to seek or hold judicial office in the future.
>
> (2) If the [CIP] finds a violation pursuant to Rule 6 for which the imposition of discipline is not warranted, it may dismiss. If the [CIP] finds that there is reasonable cause to believe the judge committed misconduct:
>
>> (a) it may propose to the judge a private admonition, a deferred discipline agreement, or an agreement by the judge to resign or retire, and if the judge consents, it shall admonish the judge or implement the deferred discipline agreement or the agreement to resign or retire;

(b) if the judge does not consent to the admonishment, or the deferred discipline or resignation or retirement, the Investigative Panel may direct the Director either to file formal charges or dismiss the complaint; or

(c) it may direct the Director to file formal charges.

JQC Rule 17(D).

If the CIP determines formal charges should be filed, the Director files the charges with the Hearing Panel, and the Clerk of the Supreme Court receives a copy. JQC Rule 19. After formal charges are filed, the subject of the complaint files an answer and the Hearing Panel of the JQC establishes the scheduling of "discovery, motions, and a public hearing." JQC Rules 19, 20, 22, 24. "At any time after the filing of formal charges and before final disposition, the [subject of the complaint] may agree with the Director" to a sanction, or the Director may withdraw the formal charges with the CIP's consent. JQC Rules 23, 24(B). Any agreement to a sanction is subject to review by the Hearing Panel, who can either reject it or file it with the Supreme Court of Georgia for approval. JQC Rule 23(B). If the matter goes before the Hearing Panel, the Director presents evidence and calls witnesses on the formal charges. JQC Rule 23(C). Both parties may "present evidence and produce and cross-examine witnesses." JQC Rule 23(C)(4). After the public hearing, the Hearing Panel can "either dismiss the case or recommend a sanction to the Supreme Court." JQC Rule 23(D). In a case where sanctions or a "Notice of Exceptions" are filed, the Clerk of the Supreme Court dockets the case for review by the Supreme Court of Georgia. JQC Rule 25. At every stage of these proceedings, the subject of the complaint has a right to retain counsel. JQC Rule 9.

## II.    The Code of Judicial Conduct—Canon 4 & Alleged Violations

The Code of Judicial Conduct applies to "[a]nyone, whether or not a lawyer, who performs judicial functions under the Constitution and laws of Georgia, including . . . any person who is a judicial candidate . . . [and is defined as] a judge for the purpose of this Code." Ga. Code Jud. Conduct, *Application*, at 10 (July 20, 2020). The three members of the Special Committee investigate alleged Canon 4 violations reported to the JQC and deemed by the Director as facially credible. (Doc. 5 ¶18).

6

Canon 4 is titled "Judges Shall Refrain from Political Activity Inappropriate to their Judicial Office." (Doc. 5 ¶ 10 (*citing* Ga. Code Jud. Conduct, Canon 4)). The pertinent language of Canon 4 provides:

**Rule 4.1 Political Conduct in General**

(A) A judge or a judicial candidate for public election to judicial office shall not: . . .

(2) make speeches for a political organization or candidate or publicly endorse another candidate for public office . . .

**Rule 4.2 Campaign Conduct**

(A) *Judicial candidates*: . . .

(2) shall not make statements or promises that commit the candidate with respect to issues likely to come before the court that are inconsistent with the *impartial* performance of the adjudicative duties of judicial office; [and]

(3) shall not use or participate in the publication of a false statement of fact, or make any misleading statement concerning themselves or their candidacies, or concerning any opposing *judicial candidate* or candidacy, with *knowledge* of the statement's falsity or with reckless disregard for the statement's truth or falsity . . .

Ga. Code Jud. Conduct, Canon 4 (emphasis in original).

The commentary [1] for Rule 4.2 states: "This Canon does not prohibit a judge or judicial candidate from publicly stating his or her personal views on disputed issues, . . . [but] encourage[s candidates] to emphasize in any public statement their duty to uphold the law regardless of their personal views." *Id*. at 49 (citing *Republican Party v. White*, 536 U.S. 765 (2002)) (original emphasis omitted). The commentary for Rule 4.2 is lengthy and continues its specifications in [3] with:

Judicial candidates may receive questionnaires or requests for interviews from the media and from issue advocacy or other community organizations that seek to learn their views on disputed or controversial legal or political issues. Rule

> 4.2(A)(2) does not specifically address judicial responses to such inquiries. *Depending upon the wording and format of such questionnaires, judicial candidates' responses might be viewed as pledges, promises, or commitments to perform the adjudicative duties of office other than in an impartial way.* To avoid violating Rule 4.2(A)(2), therefore, *judicial candidates who respond to media and other inquiries should also give assurances that they will keep an open mind and will carry out their adjudicative duties faithfully and impartially if elected.*

Ga. Code Jud. Conduct, Canon 4—*Commentary*, at 50 (emphasis added; original emphasis omitted).

The JQC letters allege Plaintiffs' joint campaign commercial and joint appearances at events related to reproductive freedom—along with statements made at the events, "may violate" Rule 4.1(A)(2), 4.2(A)(2) and 4.2(A)(3). (Doc. 5 ¶¶ 25–27; Doc. 7 at 5; Doc. 31-1 at 10–13, 25–28). Plaintiffs assert Rule 4.1(A)(2), 4.2(A)(2) and 4.2(A)(3), as applied to them by the Special Committee, violate their First and Fourteenth Amendment rights. (Doc. 5 ¶¶ 10–15, 24–29, 33–37, 43).

The JQC letters sent to Plaintiffs Jordan and Rankin are very similar in nature; thus, the Court summarizes the pertinent details. (*See* Doc. 31-1 at 10–13, 25–28). Plaintiffs' joint campaign commercial contains the statements:

> Jordan: "We're running for Georgia Supreme Court to fight for what's fair."
>
> Rankin: "We've taken on big corporations and insurance companies that profit off your pain."
>
> Jordan: "And taken down child predators and domestic abusers that threaten your safety."
>
> Rankin: "We've fought and we've won."
>
> Jordan: "We'll fight for you."
>
> The end of the joint commercial displays both Plaintiffs' names together and notes "Paid for by Friends of Jen Jordan. Paid for by Miracle for Georgia."

(Doc. 31-1 at 11, 26; Doc. 5 ¶¶ 25–26; Doc. 7 at 5).

As to the joint appearances at reproductive freedom events, the JQC Director and/or Special Committee noted Plaintiffs' statements conveying their individual intent to "restore abortion rights," and their respective campaigns' shared footage or photographs on social media, which was a potential violation of the Rules mentioned above. (Doc. 31-1 at 11–12, 26–27; Doc. 5 ¶ 27; Doc. 7 at 5). Both JQC letters attached a photograph of Plaintiff Jordan standing behind a podium covered in three signs that say, "RESTORE ABORTION RIGHTS." (Doc. 31-1 at 18, 32). Plaintiff Rankin's name, nor image are in the photograph. The JQC letter to Plaintiff Jordan includes another picture of a social media post, with a written statement and the same photograph described above. (Doc. 31-1 at 19). Plaintiff Jordan's post states,

> In Savannah, I was honored to stand alongside Shanette Williams, whose beloved daughter, Amber Thurman, died after the Georgia Supreme Court's decision to uphold the state's abortion ban left her unable to access lifesaving medical care.
>
> Georgia's Supreme Court is the last line of defense for our state constitutional rights. It's vital we elect judges who will protect our fundamental freedoms – not act as a rubber stamp for the politicians who appointed them.

(*Id*.).

The JQC letter to Plaintiff Jordan asserts that her shared endorsement with "Reproductive Freedom for All" and its characterization of Jordan as "A champion for reproductive freedom!" may violate Rule 4.2(A)(2), and the shared endorsement with "EMILYs LIST" an organization "work[ing] to elect Democratic pro-choice women up and down the ballot and across the country with a goal of fighting for our rights and our communities[,]" may violate the same rule. (Doc. 31-1 at 12 (citing https://reproductivefreedomforall.org/about/; *and* https://emilyslist.org/about/); Doc. 7 at 6). The JQC letter to Plaintiff Rankin states that her shared endorsements with "Reproductive Freedom for All" and "EMILYs LIST" on Rankin's social media platforms may violate Rule 4.2(A)(2). (Doc. 31-1 at 27 (citing https://emilyslist.org/about/; *and* https://reproductivefreedomforall.org/about/); Doc. 7 at 6). Plaintiffs were expected to

respond to their respective JQC letters within three days, per JQC Rule 29(B)(4)(a). (Doc. 5 ¶ 22, 30, 31, 38; Doc. 7 at 6; Doc. 31-1 at 12, 27). The JQC letters "did not include a request to bring [Plaintiffs'] behavior into compliance with the Code or to otherwise take any action besides submitting a confidential written response addressing the allegations to the Special Committee." (Doc. 31-1 at 4).

## III.    Self-Censorship, Continued Self-Censorship & Fear of Prosecution

Since receiving the JQC letters, Plaintiffs have not publicly shared the details of the allegations. (*See* Doc. 1; Doc. 7 at 6–7; Docs. 40-1, 40-2). While according to JQC's Director, the social media posts regarding reproductive freedom, shared endorsements, and the joint campaign commercial at issue in the JQC letters are still readily available and displayed on Plaintiffs' respective campaign accounts, Plaintiffs aver that since receiving the JQC letters, each has censored herself while speaking publicly and campaigning. (Doc. 31-1 at 4–8; Doc. 40-1 ¶¶ 3, 5–7; Doc. 40-2 ¶¶ 3–8). Plaintiff Rankin has "avoided using the phrase 'reproductive healthcare' or speaking directly about the issue" rather, she "used more broad language[.]" (Doc. 40-2 ¶ 3). Plaintiff Rankin further avers that she has received endorsements from organizations and individuals but has not shared those endorsements or collaborated with the organizations for fear of JQC prosecution. (Doc. 40-2 ¶¶ 6–8). Plaintiff Jordan states, since receiving the JQC letter, she has purposefully not used a speech she previously presented on her "personal experience suffering eight miscarriages, and why I feel so strongly that women must have control over decisions affecting their bodies and health" for fear of JQC prosecution. (Doc. 40-1 ¶6). Plaintiff Jordan further avers that the recent release of the grand jury testimony she provided as a Georgia State Senator, regarding the 2020 presidential election, involves information important to Georgia voters; but, for fear of JQC prosecution, Plaintiff Jordan has not "address[ed], distribute[d] publicly, or otherwise aplif[ied her] testimony." (Doc. 40-1 ¶ 7).

### JURISDICTION

The Court must satisfy itself that it has legal authority and a right to hear a case. *See* U.S. Const., art. III, § 2. "Article III of the Constitution confines the federal judicial power to 'Cases' and 'Controversies.'" *United States v. Texas*, 599 U.S. 670, 675 (2023). "Federal

courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). Thus, as an initial matter, the Court must determine (1) whether the Plaintiffs have standing to bring the cause of action, (2) whether the cause of action is ripe for judicial review, and even if the Court finds standing and ripeness, (3) whether the *Younger* abstention doctrine should apply. *See Younger v. Harris*, 401 U.S. 37 (1971).

## I. Plaintiffs' Standing & Ripeness

Under Article III of the Constitution, a plaintiff must have standing to bring suit in federal court. "The party invoking federal jurisdiction bears the burden of establishing standing." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). For a plaintiff to have standing, a plaintiff must show (1) a "concrete and particularized, and actual or imminent" "'injury in fact', (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Id.* at 157–58 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). All three requirements must be met for a plaintiff to establish that the suit is properly before the federal court.

Along with standing, "[r]ipeness . . . is a 'justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003)). To determine if the allegations in a complaint are "concrete enough to be ripe," a court must review "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Wollschlaeger*, 848 F.3d at 1304 (citation omitted). As with *Susan B. Anthony* and *Wollschlaeger*, this case is in a pre-enforcement posture and the "Article III standing and ripeness issues boil down to the same question." *Wollschlaeger*, 848 F.3d at 1304 (citation omitted). That question is whether Plaintiffs are threatened with injury traceable to the challenged Rules under Canon 4, such that there is

sufficient hardship to Plaintiffs if the Court withholds consideration until there is enforcement—through further investigation and/or public statement. *Id.*

**A. Injury in Fact**

"[A] plaintiff satisfies the injury-in-fact requirement where [s]he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony*, 573 U.S. at 159 (citation omitted). The Eleventh Circuit sets forth a two-part test for plaintiffs to establish an injury-in-fact in pre-enforcement cases. *See Wollschlaeger*, 848 F.3d at 1305. First, a plaintiff must allege self-censorship. *Id*. Second, there must be "a credible threat of prosecution[.]" *Id*.

Plaintiffs point to several ways they have censored themselves while campaigning since receiving the JQC letters. (Docs. 40-1, 40-2). The self-censorship includes both Plaintiffs cessation of use of the phrase "reproductive rights," and using "women's health" instead. (Doc. 40-1 at 1; Doc. 40-2 at 1). Moreover, Plaintiff Rankin has refrained from publicly acknowledging endorsements she received from different organizations and refrained from collaborating with others in social media posts. (Doc. 40-2). Plaintiff Jordan has not used a speech she previously gave as a State Senator regarding abortions and reproductive health and has not publicly discussed her involvement in the 2020 election case involving President Donald Trump. (Doc. 40-1). Plaintiffs each attribute their self-censorship to the JQC letter and fear of prosecution by the Special Committee, to include the Special Committee's power to make a public statement about alleged violations of Canon 4 at a critical time in their respective campaigns. (Docs. 40-1, 40-2; Doc. 7 at 31).

Furthermore, the JQC letters indicate the Special Committee's commitment and intent to enforce the Rules under Canon 4 to Plaintiffs' speech. *Susan B. Anthony*, 573 U.S. at 164 (history of past enforcement against the same conduct can evidence threat of prosecution in the future); *Wollshlaeger*, 848 F.3d at 1305 (a plaintiff must allege self-censorship and allege a credible threat of prosecution). Plaintiffs' fear of prosecution, especially the potential releasing of a damaging public statement days before an election, is objectively reasonable. *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998)

(the fear of prosecution must be objectively reasonable and cannot be based on a party's subjective fear); *Am. C.L. Union v. The Fla. Bar*, 999 F.2d 1486, 1492–94 (11th Cir. 1993) (a reasonable fear of disciplinary action suffices when First Amendment rights are involved and free speech is chilled). Thus, the injury-in-fact requirement is satisfied.

## B. Causation

The second element to establish standing is causation. Plaintiffs must allege "a sufficient causal connection between the injury and the conduct complained of." *Susan B. Anthony*, 573 U.S. at 157–158. The causal connection between the chilled speech and the threat of possible prosecution must be directly attributed to the JQC and Special Committee's interpretation and enforcement of Canon 4. Considering Plaintiffs' declarations, the JQC letter, and the subsequent actions by the Parties, there is a direct correlation between the JQC Director and Special Committee's review of the complaint, the JQC letter, and the Special Committee's enforcement practices and procedures to the alleged violation of Plaintiffs' First Amendment rights and Plaintiffs' chilled speech. Accordingly, the second element is satisfied.

## C. Likelihood of Redress

Finally, the Court finds that the injury alleged, a violation of Plaintiffs' First Amendment rights to free speech, can be redressed by the Court enjoining Defendants from enforcing the Rules under Canon 4 "in a manner that violates the First Amendment[.]" (Doc. 7 at 11). Thus, the redressability element is satisfied. Accordingly, the Court finds Plaintiffs have standing to bring the current case before the Court; and ripeness is satisfied.

## II.     *Younger* Abstention

Having found venue, standing, and ripeness, the Court must evaluate whether the *Younger* abstention doctrine should apply. Under *Younger* and its progeny, there are three clearly delineated exceptions requiring a federal court to abstain from hearing a case: (1) state criminal prosecutions, *Younger*, 401 U.S. 37; *Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1262–63 (11th Cir. 2004); (2) civil proceedings akin to criminal prosecutions, *Huffman v. Pursue, Ltd.*, 420 U.S. 593 (1975); and (3) civil proceedings involving "important state policies or for the functioning of the state judicial system", *Middlesex*

*Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982); *Butler v. Alabama Jud. Inquiry Comm'n*, 261 F.3d 1154, 1158–59 (11th Cir. 2001) (*Butler II*). If none of the *Younger* abstention exceptions apply, "the general rule governs: 'The pendency of an action in a state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976)). Defendants' assert *Younger* abstention doctrine should apply, and the Court should abstain from hearing this case because the implications of Plaintiffs' request offend the ideals of comity and federalism. (Doc. 31 at 1, 13); *see also Younger*, 401 U.S. at 41; *and Butler II*, 245 F.3d. at 1261. As this is a civil proceeding involving the functioning of the State judicial system, it is of the type implicating *Younger*.

"Where vital state interests are involved, a federal court should abstain unless state law clearly bars the interposition of the constitutional claims." *Middlesex*, 457 U.S. at 432 (citation omitted). In *Middlesex*, the Supreme Court established three questions federal courts must ask prior to abstaining under *Younger*. *Middlesex*, 457 U.S. at 432. Here, the Court must first inquire whether the JQC's judicial elections compliance process constitutes ongoing state judicial proceedings. *Id.* Second, the Court considers whether the process implicates important state interests. *Id.* Third, the Court considers whether there is an adequate opportunity in the state proceedings to raise constitutional challenges." *Id.*; *see also Butler v. Alabama Jud. Inquiry Comm'n*, 245 F.3d 1257, 1262 (11th Cir.), *certified question answered*, 802 So. 2d 207 (Ala. 2001) (*Butler I*). As both Parties agree that this case involves important State interests, which it clearly does, the Court will focus on the first and third considerations. *See Butler I*, 245 F.3d at 1262 (it is not in dispute that the state ethical proceedings involve an important state interest); *Middlesex*, 457 U.S. at 434–35 (the state "has an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses").

### A. Ongoing State Judicial Proceeding

Under the Rules of the JQC, "[p]roceedings means all steps in the discipline . . . system set forth in these Rules[; whereas] . . . [s]creening means examination of a complaint

or other information coming to the attention of the Director to determine whether the Commission has jurisdiction and whether the information would constitute judicial misconduct . . . ." Rules of the Jud. Qualifications Comm'n—*Terminology*, at 3–4 (Feb. 3, 2023). In *Middlesex*, the Supreme Court, citing New Jersey Supreme Court precedent, held that, because

> [t]he New Jersey Supreme Court ha[d] made clear that filing a complaint with the local Ethics and Grievance Committee 'is in effect a filing with the Supreme Court' . . . [and that f]rom the very beginning a disciplinary proceeding is judicial in nature, initiated by filing a complaint with an ethics and grievance committee*[, it was] clear beyond doubt that the New Jersey Supreme Court considere[d] its bar disciplinary proceedings as 'judicial in nature.'*

*Middlesex*, 457 U.S. at 433–34 (emphasis added). The Court pointed to a New Jersey Supreme Court opinion explicitly holding that:

> the filing of a complaint with one of our ethics and grievance committees is in effect a filing with the Supreme Court, in which alone the power to discipline attorneys-at-law in New Jersey resides. The several county ethics and grievance committees established under our rules of court are arms of the court which perform the very important functions of receiving complaints, investigating them, holding hearings on them, and then presenting their findings to the court. The Supreme Court, however, has at all times full control over the proceedings and regardless of the conclusion of the committee a full report must be submitted to the court, which, although giving due weight to the findings and conclusions of the committee, has the sole responsibility of deciding whether the attorney in question should be disciplined. *From the very beginning a disciplinary proceeding is judicial in nature, initiated by filing a complaint with an ethics and grievance committee.*

*Toft v. Ketchum*, 18 N.J. 280, 284 (1955), *adhered to*, 18 N.J. 611 (1955) (emphasis added) (citations omitted).

Defendants did not present, and the Court has not found, a clear statement by the Supreme Court of Georgia to the effect that the JQC or the Special Committee are "arms of the court" or that the proceedings are judicial in nature. *Inquiry Concerning Coomer*,

315 Ga. 841, 846–47 (2023) (acknowledging the State Bar as an arm of the judiciary, but differentiating the JQC as General Assembly controlled after the 2016 constitutional referendum) ("The Constitution divides tasks associated with judicial discipline between the JQC and th[e Georgia Supreme] Court, assigning to the JQC the power to investigate, try, and recommend disciplinary sanctions in judicial misconduct matters, and vesting only th[e Georgia Supreme] Court with the power to impose disciplinary sanctions. . . . [The JQC is] a  bifurcated system where the [CIP] investigates and prosecutes allegations of judicial misconduct and the Hearing Panel adjudicates formal charges and makes recommendations to th[e Georgia Supreme] Court."); *Inquiry Concerning Coomer*, 316 Ga. 855, 865 (2023), *opinion after remand* (noting its earlier opinion "explaining that the JQC's authority to enforce the Code of Judicial Conduct is limited by state and federal due process protections, which include 'fair notice of what conduct is prohibited'"). Thus, the Court cannot find—as the *Middlesex* Court did—that the Supreme Court of Georgia considers its JQC disciplinary proceedings to be judicial in nature.

As the Court pondered during the hearing in this matter, it does not appear that the preliminary investigation and the related authority vested in the Special Committee should constitute ongoing state judicial proceedings. Rather,

> if we were to analogize these proceedings to state criminal proceedings, the case against [Plaintiffs] is still at the pre-indictment stage. As in . . . criminal proceedings, the prosecutor's office is not the appropriate stage at which the federal plaintiff's constitutional rights can be vindicated. Therefore, this stage of the proceedings is similar to that of the threatened state court criminal prosecution for which the Supreme Court held abstention inappropriate in *Steffel v. Thompson*, 415 U.S. 452 (1974).

*Garden State Bar Ass'n v. Middlesex Cnty. Ethics Comm.*, 643 F.2d 119, 128 (3d Cir. 1981). Of course, the Supreme Court rejected this reasoning, without explanation, when it reversed the Third Circuit in *Middlesex*. 457 U.S. at 429, n. 4. While it is unclear why this

reasoning did not hold sway with the Court,[2] it is clear the Supreme Court has rejected the analysis. Accordingly, the Court will find that the preliminary investigation and the related authority vested in the Special Committee constitutes an ongoing state judicial proceeding for purposes of the *Younger* analysis.

## B. Adequate Opportunity to Raise Constitutional Challenges

As set forth above, there are several paths for resolving a matter after a complaint is filed with the JQC: (1) the Director can dismiss a complaint as facially deficient; (2) the Special Committee, after preliminary investigation, can dismisses the complaint; (3) the Special Committee, after preliminary investigation and a finding of the need for "speedy intervention" can release a public statement setting out its belief that the candidate committed certain violations; (4) the Special Committee can refer the matter to the full CIP which can, after an investigation, dismiss the complaint, reach a private settlement of the matter with the accused, or file formal charges; (5) if formal charges are filed, the matter will go to a Hearing Panel who can dismiss the case or recommend a sanction to the Georgia Supreme Court; and (6) the Georgia Supreme Court will issue an opinion on whether a sanction is appropriate.

In the context of a formal complaint,

> [i]t is [the Georgia Supreme] Court's function 'to review the findings of the Commission, and to exercise its judgment based upon the entire record' in order to determine whether [the] conduct warrants discipline, and, if so, what sanctions should be imposed. In performing this independent function, [the Supreme Court] gives substantial consideration and due deference to the JQC's ability to evaluate the credibility of the witnesses who appear before it. However, [the] Court reaches its own conclusions regarding disciplinary sanctions [] and the recommendations of the JQC are not binding.

*In re Inquiry Concerning a Judge*, 275 Ga. 404, 406 (2002) (quoting *In the Matter of Inquiry Concerning a Judge,* 265 Ga. 843 (1995)). Moreover, "[n]o action shall be taken

---

[2] Notably, in a concurrence by Justice Marshall, joined by Justices Brennan, Blackburn, and Stevens, Justice Marshall writes, "it is unclear whether proceedings before the Ethics Committee are more accurately viewed as prosecutorial rather than judicial in nature." *Middlesex*, 457 U.S. at 439.

against a judge except after hearing and in accordance with due process of law." Ga. Const. art. VI, § 7, at ¶ VIII.

This, however, is not the case with regard to the Special Committee's authority to issue public statements in cases where they deem there is sufficient urgency. In this instance, the sanction—issuing a damaging public statement on the eve of an election precisely because of the imminent election—is not imposed by or reviewable by the Supreme Court of Georgia. Critical to the *Younger* analysis, to the extent that the sanction—and this Court finds that a public statement by the JQC publicly accusing a candidate of ethics violations is, in fact, a sanction—potentially violates a constitutional right, and neither the Special Committee nor the JQC have the authority to consider the constitutional question. In addressing their authority to review formal advisory opinions issued by the JQC and directing the Commission to reconsider such an opinion, the Georgia Supreme Court explained that

> the judicial discernment of constitutional, statutory, or common law is an exercise of judicial power, and in Georgia, the judicial power is 'vested exclusively' in the magistrate courts, the probate courts, the juvenile courts, the state courts, the superior courts, the Court of Appeals, and the Supreme Court. ***The Commission is not vested with any judicial power***.

*In re Judicial Qualifications Comm'n Formal Advisory Opinion No. 239,* 300 Ga. 291, 298–99 (2016) (emphasis added). Thus, at least with regard to the constitutionality of the issuance of the public statement, Plaintiffs do not have an adequate opportunity to raise a constitutional challenge.

Accordingly, *Younger* abstention does not apply to the extent that the Special Committee is authorized to take actions pursuant to Rule 29(B)(4) of the Rules of the Judicial Qualifications Commission of Georgia. To the extent that the proceedings are governed by any other provisions of the Rules—*i.e.* Rule 17—because the ultimate authority lies with the Georgia Supreme Court which has the ability to consider Plaintiffs' constitutional challenges, the Court will abstain from consideration. "'Restraining equity jurisdiction within narrow limits,' . . . 'prevent[s] erosion of the role of the ju[diciary] and

avoid[s] a duplication of legal proceedings and legal sanctions.' . . . [and reinforces] 'a proper respect for state functions.'" *Sprint*, 571 U.S. at 77 (citation omitted).

## III.    Constitutional Claims & Civil Rights Actions

Finally, federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Congress created federal recourse for plaintiffs who, under color of law, are subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a State actor. 42 U.S.C. § 1983. Thus, Plaintiffs' claims under § 1983 for violations of their First and Fourteenth Amendment rights by Defendants—in their official capacities as members of the Special Committee—is properly before the Court.

Accordingly, the jurisdictional questions for this matter have been satisfied.

## DISCUSSION

## I.    Basis for Temporary Restraining Order

A court may grant a TRO only if the movant demonstrates that "(1) [s]he has a substantial likelihood of success on the merits, (2) [s]he will suffer irreparable injury unless the injunction issues, (3) the injunction would not substantially harm the other litigant, and (4) if issued, the injunction would not be adverse to the public interest." *Long v. Sec'y*, 924 F.3d 1171, 1176 (11th Cir. 2019) (citations omitted). A TRO is an "extraordinary remedy," and courts should "pay particular regard for the public consequences" of granting this type of remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

### A. Success on the Merits

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020). Plaintiffs claim that Rules 4.2(A)(2) ("the commitments clause") and 4.2(A)(3) ("the false or misleading statements clause") of Georgia's Code of Judicial Conduct, as applied to Plaintiffs by Defendants, violate Plaintiffs' rights guaranteed by the First and Fourteenth Amendments. (Doc. 5 ¶ 43). Plaintiffs further claim

that Rule 4.1(A)(2) ("the endorsement clause"), as applied to Plaintiff's joint campaign commercial and their joint appearances at events related to reproductive freedom, violate Plaintiffs' rights guaranteed by the First and Fourteenth Amendments—as applied by Defendants. (Doc. 5 ¶ 43). Defendants assert the challenged Rules are narrowly tailored to the compelling State interest of "preserving public confidence in the impartiality of the judiciary." (Doc. 31 at 19). Defendants further assert Plaintiffs' "as-applied challenge is premature at this stage," since the JQC letters were simply "notice letters" stating there *may* be a violation of the Rules. (*Id.* at 20, 19–27; Doc. 31-1 at 10–13, 25–28).

Under the "[p]rinciples of constitutional avoidance . . . a court should hesitate to address the rules' constitutionality without first deciding whether the rules cover the challengers' conduct." *Fischer v. Thomas*, No. 25-5385, 2026 WL 1296146, at *4 (6th Cir. May 12, 2026) (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)) (*Fischer II*). In *Fischer II*, the Sixth Circuit considered a challenge to two similar ethics rules for state judicial candidates regarding a commitment clause and an endorsement clause. *Id*. at *6. As discussed above regarding *Younger* abstention, the Court abstains from making a determination best left to the JQC and the Georgia Supreme Court on whether there was a violation of the Rules by Plaintiffs. Rather, this Court limits the review of the constitutional claims, as-applied, to the Special Committee's initial application (JQC letters), the possibility of a public statement, and the attendant chilling effect on Plaintiffs' speech.

"The First Amendment provides that Congress 'shall make no law ... abridging the freedom of speech.' The Fourteenth Amendment makes that prohibition applicable to the States." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 442 (2015) (citing *Stromberg v. California,* 283 U.S. 359, 368 (1931)). Political speech "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). "[S]peech about public issues and the qualifications of candidates for elected office commands the highest level of First Amendment protection." *Williams-Yulee*, 575 U.S. at 443 (citing *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989)). "[A]voiding judicial preconceptions on legal issues is neither possible nor

desirable, pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest either." *White*, 536 U.S. at 777–78. "Even in nonpartisan judicial elections, the First Amendment protects candidates' rights to share information about how they will approach the issues of the day." *Fischer II*, No. 25-5385, at \*7 (citing *Carey v. Wolnitzek*, 614 F.3d 189, 202 (6th Cir. 2010)) (candidates' "using the term 'conservative' or 'Republican' . . . doesn't itself communicate that candidates are nominees of a political party . . . [it] simply convey[s a judicial candidate's] membership in a political party and his ideology. . . . [And candidates who] received support from local pro-life groups . . . [or] pro-life groups' endorsements" do not constitute a pledge or commitment.). For First Amendment claims, the Court applies a "strict-scrutiny test," and Defendants "have the burden to prove the Rules are "(1) narrowly tailored, to serve (2) a compelling state interest." *White*, 536 U.S. at 774–75; *see Weaver v. Bonner*, 309 F.3d 1312, 1318–19 (11th Cir. 2002) ("When a State seeks to restrict directly the offer of ideas by a candidate to the voters, the First Amendment surely requires that the restriction be demonstrably supported by not only a legitimate state interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression." (citation omitted)). An as-applied challenge to a law, argues the law is unconstitutional only as enforced against the plaintiff.

As the Supreme Court explained in *White*, "'announcing views' on an issue covers much more than *promising* to decide an issue a particular way. The prohibition [in *White*] extend[ed] to the candidate's mere statement of his current position, even if he does not bind himself to maintain that position after election." *Id*. at 770 (emphasis in original). The Supreme Court noted the difference between announcing one's views versus committing oneself to a particular issue. *Id*. The issue now before the Court is a pledges or promises clause, and the *White* Court explicitly did not address its ruling to those cases. *Id*. (the "'pledges or promises' clause . . . is not challenged here and on which we express no view."). The Eleventh Circuit also has not spoken directly to this question. Thus, the Court finds the Sixth Circuit's *Fischer* opinions instructive in considering the pledges or promise provision. *Fischer v. Thomas*, 52 F.4th 303, 311–12 (6th Cir. 2022) (*Fischer I*) (finding

endorsements by non-political organizations does not evidence a pledge or commitment and identifying oneself as "conservative" or "Republican" as a "shorthand" way to communicate a judicial candidate's "views on many issues at once" is protected by the First Amendment); *Fischer II*, No. 25-5385, at \*7 (reaffirming the First Amendment protections for shorthand communications and finding the as-applied challenges to the "Nominee and Endorsement Rules" and "Commitment Rule" violate First Amendment protected speech).

Under Canon 4, Rule 4.2(A)(2) applies to "statements or promises that *commit* the candidate . . . to *issues likely* to come before the court . . . ." *Id.* (emphasis added). Defendants argue the additional limitation within Rule 4.2(A)(2)'s scope—to speech that is "inconsistent with the *impartial* performance of the adjudicative duties of judicial office"—properly limits the enforcement and curtailment of speech to uphold the compelling state interest in an impartial judiciary. *Id.*; (Doc. 31 at 23–26). The Supreme Court considered and rejected a similar argument in *White*:

> A judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice, and with good reason. For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law. . . . 'Since most Justices come to this bench no earlier than their middle years, it would be unusual if they had not by that time formulated at least some tentative notions that would influence them in their interpretation of the sweeping clauses of the Constitution and their interaction with one another. It would be not merely unusual, but extraordinary, if they had not at least given opinions as to constitutional issues in their previous legal careers'

*White*, 536 U.S. at 777–78 (citation omitted). As the *White* decision noted, "limiting the scope of the clause to issues likely to come before a court is not much of a limitation at all. . . . [And] construing the clause to allow 'general' discussions of case law and judicial philosophy turns out to be of little help in an election campaign." *White*, 536 U.S. at 772–73.

The same was found in *Fischer II*, which dealt directly with a commitment clause banning "candidates from making 'pledges, promises, or commitments' if they are in 'connection with cases, controversies, or issues that are likely to come before the court.'" *Fischer II*, No. 25-5385, at *8 (citing Ky. Sup. Ct. R. 4.200, Rule 4.1(A)(13)). "[C]andidates have a constitutional right to take a position on the 'issues of the day' without giving explicit pledges about how they will rule[.]" *Id*. Accordingly, Plaintiffs' speech regarding "reproductive rights," abortion, or having endorsements or support from pro-choice platforms, "EMILYs LIST", or other organizations (not directly representing a political party) is protected by the First Amendment. Here, none of the language cited by Defendants in the JQC Letters contain explicit pledges. Considering *White* and the reasoning in the *Fisher* opinions, there is a likelihood of success on the merits of Plaintiffs' First and Fourteenth Amendment claim to Defendants' application of the "the commitments clause" or "the endorsement clause" to Plaintiffs statements or endorsements covering "reproductive freedom for all," "EMILYs LIST" or "restoring abortion rights." (Doc. 31-1 at 11–12 ¶¶ 2–4, 26–27 ¶¶ 2–4).

The Court next considers the alleged violations of Rule 4.1(A)(2) ("the endorsement clause") and Defendants' allegation regarding Plaintiffs' joint appearances in a commercial and at non-political party events. (Doc. 31-1 at 11 ¶¶ 1–2, 26 ¶¶ 1–2). Rule 4.1(A)(2) is ambiguous and fails to provide fair notice as applied. For example, per the JQC letters, the joint appearances of Plaintiffs in commercials has been identified as a possible violation, but candidates for the Supreme Court of Georgia can fundraise together, participate in joint conferences, and make public donations to each other's campaigns.[3] (Doc. 45 at 64, 76–78). The activities set forth in allegation ¶ 2 of the JQC letters is protected by the First Amendment, and Rule 4.1(A)(2) is not sufficiently narrowly tailored. As-applied, Rule 4.1(A)(2) is not constitutional. Accordingly, there is a likelihood of success on the merits

---

[3]    The Court is unsure how Plaintiff Rankin is alleged to have committed the violation set forth in ¶ 2 and the affixed attachment "B." (Doc. 31-1 at 26, 32). She is not named, referenced, pictured, or attributed with anything as evidenced by the attachment—there is a small part of a campaign sign that potentially has her name on it, but it is unclear. (Doc. 31-1 at 32).

of Plaintiffs' First and Fourteenth Amendment Claim for 4.1(A)(2) for ¶ 1 and ¶ 2 of the JQC letters. (Doc. 31-1 at 11 ¶¶ 1–2, 26 ¶¶ 1–2).

As to the joint campaign commercial and Rule 4.2(A)(3) ("the false or misleading statements clause"), it is unclear what statements were false or misleading. (Doc. 31-1 at 11 ¶ 1, 26 ¶ 1). Thus, the Court finds the application of Rule 4.2(A)(3) to Plaintiffs' joint commercial fails to put Plaintiffs on notice as to which statements were potentially a violation under the Rule. As the Eleventh Circuit noted in *Wollschlaeger*, "[d]emarcating [a] line with some clarity and precision is crucial" when giving parties fair notice of the rules' expectation "[i]n the absence of a statutory definition" or providing from whose point of view. *Wollschlaeger*, 848 F.3d at 1321. Accordingly, Plaintiffs' claims have a substantial likelihood of success on the merits.

### B. Immediate and Irreparable Injury

In addition to showing a substantial likelihood of success on the merits, Plaintiffs must also show that there will be irreparable harm if relief is not granted. "[T]he absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176–77 (11th Cir. 2000). "[I]rreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Id*. (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir.1989)); *accord, Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir.1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable."). As the Court addressed in the jurisdiction and *Younger* analyses, the injury to Plaintiffs by Defendants' ability to issue a non-confidential public statement of the potential violations of the Canons in the final days of a "hotly contested election," absent the procedural safeguards set forth in the JQC Rules or the opportunity for review by the Supreme Court of Georgia, is an injury that is immediate and irreparable.

### C. Balance of Harms

The next question before the Court is whether the potential harm to Plaintiffs if the Court does not grant injunctive relief outweighs the potential harm to Defendants if the relief is granted. The relief requested by Plaintiffs is to enjoin Defendants from

investigating the allegations contained in the JQC letters. That relief goes beyond what the Court will consider. As discussed in detail above and at the hearing, the immediate harm of a public statement alleging violations, without proper consideration of Plaintiffs' constitutional claims greatly outweigh the Defendants' right to make a public statement after only a preliminary review in what is supposed to be a confidential procedure according to the JQC's own rules and Georgia statute. JQC Rule 11; O.C.G.A. § 15-1-21(k). Accordingly, the balancing of harms favors granting a curtailed variation of the relief sought.

### D. Public Interest

Finally, the Court must determine whether granting injunctive relief will serve the public interest. The public's interest in knowing who they are voting for and what each candidate's views are was recognized by the Supreme Court in *White*. Moreover, upholding the constitutional guarantees under the United States' Constitution and the Georgia Constitution, and procedures in Georgia statute, is in the public's interest. Accordingly, this factor weighs in favor of granting narrow relief. Accordingly, Defendants are enjoined from issuing a non-confidential Public Statement on the JQC letters or the violations alleged therein.

## II. Duration

Pursuant to Federal Rule of Civil Procedure 65, TROs are limited to 14 days. Thus, this TRO will remain in effect as set forth in the Court's May 15, 2026 Order (Doc. 48). Any motions for an enlargement of the TRO must demonstrate good cause and must be filed in accordance with the requirements of Federal Rule of Civil Procedure 65(b)(2).

## III. Security

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978). As the Court discussed in the May 15,

2026 Order (Doc. 48), the Court finds that no security is required at this point in the proceedings. Should Defendants make a showing that security is appropriate for the issuance of further injunctive relief, the Court will give further consideration to the matter of security.

## CONCLUSION

It is **ORDERED** that Plaintiffs' request for a temporary restraining order is **GRANTED in part**, Defendants are enjoined from issuing a non-confidential Public Statement on the April 27, 2026 notice letters (JQC letters) or the violations alleged therein. The request to prohibit Defendants from continuing the investigation of Plaintiffs' campaign statements and from otherwise enforcing Canon 4 and Rules 4.1(A)(2), 4.2(A)(2), and 4.2(A)(3) of Georgia's Code of Judicial Conduct against Plaintiffs' campaign statements and conduct identified in the JQC letter is **DENIED**.

This is the Court's Final Order setting forth its findings of fact and conclusions of law.

**SO ORDERED**, this 18th day of May, 2026.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**